IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **FRANCISCO RAMOS-BECERRA,** | : | |
| **and LOUISA RAMOS,** | : | |
| | : | **Civ. No. 1:14-CV-0917** |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **RICKY L. HATFIELD, HATFIELD** | : | |
| **TRUCKING, and JB HUNT** | : | |
| **TRANSPORT, INC.,** | : | |
| | : | **Judge Sylvia H. Rambo** |
| **Defendants.** | : | |

# M E M O R A N D U M

In this civil action, Plaintiffs bring claims for negligence and loss of consortium against Defendants as a result of injuries suffered in a motor vehicle accident. Presently before the court is Defendant JB Hunt Transport Inc.'s motion *in limine*, or, alternatively, request for a *Daubert* Hearing to preclude the testimony and opinions of Plaintiffs' expert. (Doc. 68.) For the reasons that follow, Defendant JB Hunt Transport Inc.'s motion will be denied.

## I.    **Background**

### A.    **Facts**[1]

Plaintiffs Francisco Ramos-Becerra and Louisa Ramos (together, "Plaintiffs") are Mexican citizens that reside in Chambersburg, Pennsylvania.

---

[1] The court will present the relevant allegations of the complaint. The statements contained herein reflect neither the findings of fact nor the opinion of the court as to the veracity of Plaintiffs' allegations.

(Doc. 1 at ¶ 1.) Prior to the events of November 19, 2013, JB Hunt Transport, Inc. ("JB Hunt"), an Arkansas corporation, entered into a trucking transport contract with Ricky L. Hatfield ("Hatfield"), a citizen of Tennessee, and his company, Hatfield Trucking, a Tennessee corporation. (*Id.* at ¶¶ 2-4, 12-13.) At the time the parties entered into the contract, Hatfield had a slew of past motor vehicle violations, including a 2009 conviction for driving under the influence while operating a tractor trailer, which JB Hunt did not discover prior to hiring him. (*Id.* at ¶¶ 12-13.) On November 19, 2013, at 5:03 p.m., Hatfield was driving northbound on Interstate-81 in a Hatfield Trucking vehicle while under the influence of alcohol. (*Id.* at ¶¶ 16, 17, 22, 26.) Hatfield swerved his vehicle onto the shoulder, striking two parked cars and two individuals, including Ramos-Becerra, who suffered catastrophic injuries. (*Id.* at ¶¶ 23, 29, 31.)

For the purposes of this litigation, Plaintiffs retained the services of Brooks Rugemer ("Mr. Rugemer"), a trucking industry safety expert, to opine as to the contractor screening policies and practices of JB Hunt and the driving actions of Hatfield. (Doc. 68-2, p. 3 of 50.) In his expert report issued on February 16, 2016, Mr. Rugemer states that his opinions contained therein are based on his thirty years of experience working in various capacities in the trucking industry, including as a consultant in restructuring driver recruitment departments, a safety and human resources manager, and a terminal manager. (*Id.* at pp. 13-15 of 50.) In

addition, Mr. Rugemer received several professional certifications in the study of the Federal Motor Carrier Safety Regulations ("FMCSRs") and is a certified instructor for the National Transportation Safety Institute. (*Id.* at p. 15 of 50.) Mr. Rugemer indicates that he reviewed numerous materials prior to forming the his opinions and conclusions regarding the instant case, including: (1) the Pennsylvania State Police report; (2) the accident reconstruction report; (3) Plaintiffs' complaint; (4) JB Hunt's answers to Plaintiffs' interrogatories; (5) documents produced by JB Hunt in response to Plaintiffs' document requests; (6) the Hatfield contractual agreement with JB Hunt; (7) district attorney records and photographs; (8) Pennsylvania State Police photographs; (9) Hatfield's employment records from TCT Trucking, Inc.; (10) Hatfield's driving records from the Utah Department of Public Safety; (11) Hatfield's driving records from the Tennessee Highway Patrol; (12) Hatfield's driving records from the Maryland State Police; (13) the Hatfield deposition dated February 13, 2015 and July 9, 2015; (14) the Derek Jones deposition dated September 1, 2015; (15) the Vanessa Hernandez deposition dated September 1, 2015; (16) the CB Mahaffrey deposition dated September 2, 2015); (17) the Stan Hampton deposition dated September 2, 2015; (18) the Francisco Ramos-Becerra deposition dated November 18, 2015; (19) the Deborah Winkler deposition dated January 20, 2016; (20) the Crystal Minardi deposition dated January 20, 2016; (21) the Michael Napier report; and

(22) documents from the Owner Operator Independent Drivers Association. (*Id.* at

p. 3 of 50.)

Based on his experience as well as his "training and knowledge of the

[FMSCRs], OSHA Regulations, and recognized and accepted Transportation

Industry Standards and Best Practices" (*Id.* at p. 4 of 50), Mr. Rugemer came to the

following conclusions "within the bounds of reasonable Professional certainty:"

> 1. Operation of a tractor trailer can pose a danger to the public unless the vehicle is operated by a competent driver who exhibits appropriate judgment and sense.
>
> 2. JB Hunt breached the standard of care by failing to perform any industry recognized screening of Hatfield prior to engaging his services to haul trailers. Since Hatfield had no safety rating on the Safersys.org [website,] JB Hunt was negligent in not taking any steps to check on Hatfield's background including his driving record.
>
> 3. JB Hunt hired Hatfield even though a basic background check would have shown his conviction for driving a tractor trailer under the influence in 2009. JB Hunt never should have engaged Hatfield to transport trailers including the Walmart blitz campaign which had Hatfield operating a tractor in and around central Pennsylvania.
>
> 4. Hatfield became intoxicated on November 19, 2013 after receiving a dispatch to return to Fredericksburg[,] VA to deliver a trailer to Bensalem on November 20, 2013.
>
> 5. Francisco Ramos would not have been injured on November 19, 2013 had JB Hunt not hired Hatfield to haul trailers.
>
> 6. Ricky Hatfield breached the standard of care by operating his tractor under the influence of alcohol which caused the accident in which Ramos was injured.

(*Id.* at p. 12 of 50.)

**B.**         **Procedural History**

Plaintiffs initiated this action by filing a complaint against Hatfield, Hatfield Trucking, and JB Hunt on March 21, 2014 in the Eastern District of Pennsylvania. (Doc. 1.) In their complaint, Plaintiffs assert negligence claims and a loss of consortium claim under Pennsylvania law against the Defendants as a result of the November 19, 2013 accident. (*Id.* at Counts I-IV.) On May 12, 2014, the matter was transferred by joint stipulation and order to the Middle District of Pennsylvania. (Doc. 7.) On March 18, 2016, JB Hunt filed the present motion *in limine* seeking to exclude the expert testimony and opinions of Mr. Rugemer or, in the alternative, to request a *Daubert* hearing. (Doc. 68.) In its brief in support of the motion, JB Hunt argues that Mr. Rugemer does not possess the requisite qualifications to opine on freight brokers in the trucking industry and that his report is unreliable. (*See* Doc. 69.)

Plaintiffs filed a response (Doc. 70) and a brief in opposition on April 1, 2016 (Doc. 71). JB Hunt filed a reply on April 13, 2016 (Doc. 73) to which Plaintiffs, with leave of court (Doc. 80), filed a sur-reply on April 22, 2016 (Doc. 81). Thus, the motion has been fully briefed and is ripe for deposition.

## II.        <u>Legal Standard</u>

The admissibility of expert testimony is a question of law governed by Federal Rule of Evidence 702.  *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588-89 (1993).   The Third Circuit has established that "Rule 702 embodies a trilogy of restrictions on expert testimony: qualifications, reliability and fit." *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741-43 (3d Cir. 1994)). First, to be qualified, the expert witness must possess specialized knowledge regarding the area of testimony. *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000) (*Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998)). This requirement is to be liberally interpreted and "a broad range of knowledge, skills, and training" can qualify an expert. *In re TMI Litig.*, 193 F.3d 613, 664 (3d Cir. 1999) (quoting *In re Paoli*, 35 F.3d at 741). Second, "an expert's opinion must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation" to be considered reliable. *Oddi v. Ford Motor Co.*, 234 F.3d 136, 158 (3d Cir. 2000). Finally, in order to satisfy the "fit" requirement, "an expert's testimony must assist the trier of fact." *Id.* at 145. Whether an expert's testimony fits depends upon the "relevant 'connection between the scientific research or test result to be presented and particular disputed factual issues in the

case.'" *Milanowicz v. Raymond Corp.*, 148 F. Supp. 2d 525, 531 (D.N.J. 2001) (quoting *In re Paoli*, 35 F.3d at 743).

When reviewing expert testimony, a trial court must act as a gatekeeper "to ensure that 'any and all expert testimony or evidence is not only relevant, but also reliable.'" *Pineda v. Ford. Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) (quoting *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997)). However, a court must not "weigh the evidence relied upon or determine whether it agrees with the conclusions reached therein." *Walker v. Gordon*, 46 F. App'x 691, 695 (3d Cir. 2002) (citing *Daubert*, 509 U.S. at 591-93). "Determinations regarding the weight to be accorded, and the sufficiency of, the evidence relied upon by the proffered expert, are within the sole province of the jury." *Id.* (citing *Breidor v. Sears, Roebuck and Co.*, 722 F.2d 1134, 1138-39 (3d Cir. 1983)). In addition, "[t]he analysis of the conclusions themselves is for the trier of fact when the expert is subjected to cross-examination." *Oddi*, 234 F.3d at 146 (quoting *Kannankeril*, 128 F.3d at 806).

### III.   <u>Discussion</u>

In its motion in limine seeking to preclude Mr. Rugemer's testimony and/or report at trial, JB Hunt argues that Mr. Rugemer does not possess the requisite qualifications to give an expert opinion regarding freight brokers, and that his report is unreliable and does not fit because it contains incorrect information

and unsupported, conclusory statements. (Doc. 69, pp. 7-23.) The court will address each of JB Hunt's arguments in turn.

### A.        <u>Qualifications</u>

Regarding Mr. Rugemer's qualifications to testify as an expert witness in this case, JB Hunt argues that Mr. Rugemer does not possess any skill or knowledge greater than that of an average layman on the subject of freight brokers and therefore his testimony should be precluded. More specifically, JB Hunt asserts that, at all times relevant in this matter, it operated solely as a freight broker and was therefore subject to the FMCSRs related to brokers of property. Because Mr. Rugemer's report is devoid of any specific reference to the FMCSRs, JB Hunt argues that Mr. Rugemer lacks the knowledge and qualifications to render an expert opinion on freight brokers within the trucking industry.

In response, Plaintiffs assert that Mr. Rugemer did not reference the FMCSRs because they have no relevancy to the issues at hand as JB Hunt did not act as a freight broker in this matter. Instead, under the terms of the Outsource Carriage Agreement, the relationship between JB Hunt and Hatfield trucking was one of independent contractor and there were no brokers involved. Plaintiffs argue that Mr. Rugemer is clearly qualified through his education and experience to testify regarding independent contractors, and further that, even if this case only

involved the responsibilities of  freight brokers, Mr. Rugemer is still qualified to testify.

Without deciding whether JB Hunt acted as a freight broker, the court finds that Mr. Rugemer is qualified to testify in this matter. When reviewing an expert witness's qualifications, the Third Circuit requires expert witnesses "to 'have specialized knowledge' regarding the area of testimony," but allows "practical experience as well as academic training and credentials" to satisfy this requirement. *Elcock*, 233 F.3d at 741 (quoting *Waldorf*, 142 F.3d at 625). "[A]t a minimum, a proffered expert witness . . .  must possess skill or knowledge greater than the average layman." *Betterbox Commc'ns Ltd. V. BB Techs., Inc.*, 300 F.3d 325, 328 (3d Cir. 2002) (citations omitted). Mr. Rugemer's curriculum vitae demonstrates that he possesses substantial experience with the FMCSRs and driver recruitment in the trucking industry. He is a certified instructor for the National Transportation Safety Institute and has received professional certifications in the study of the FMCSRs from the Department of Transportation. (*Id.* at p. 15 of 50.) As a terminal manager for Eagle Carriers, Mr. Rugemer oversaw "all hiring and contract functions" for twenty-seven company drivers and eleven owner-operators, a type of independent contractor. (Doc. 68-2, p. 14 of 50.) While employed at Hahn Transportation, Mr. Rugemer served as a safety and human resources manager whose duties included "CDL driver recruiting, DOT compliance, and

safety training." (*Id.*) Mr. Rugemer has also been retained as a consultant by several trucking companies to restructure their driver recruitment departments. (*Id.* at p. 13 of 50.) Therefore, the court finds that Mr. Rugemer's professional certifications in the FMCSRs and extensive experience in driver recruitment satisfy the liberal requirements for serving as an expert witness. *See In re Paoli*, 35 F.3d at 741 ("We have eschewed imposing overly rigorous requirements of expertise and have been satisfied with more generalized qualifications.")

**B.      Reliability**

JB Hunt further argues that Mr. Rugemer's opinions are unreliable because  he fails to cite to any applicable law, including the FMCSRs, and instead relies on third party opinion articles. In response, Plaintiffs contend that, while Mr. Rugemer does in fact cite to the applicable law, he does not cite to the FMCSRs because, as discussed above, JB Hunt did not act as a freight broker and was therefore not subject to the FMCSRs. Instead, Pennsylvania common law governed JB Hunt's responsibilities in regard to its selection of contractors.  As to Mr. Rugemer's reference to opinion articles, Plaintiffs contend that the foundation of Mr. Rugemer's opinions is reliable and it is not for the court to decide which party is utilizing the best evidence.

When judging the reliability of an expert witness's opinions, "*Daubert* does not require a paradigm of scientific inquiry as a condition precedent to

admitting expert testimony, [but] it does require more than . . . haphazard, intuitive inquiry." *Id.* at 156. Specifically, *Daubert* requires that an expert witness's conclusions rely on the methods and principles of science or "good grounds." *In re Paoli*, 35 F.3d at 732. However, "any step that renders the analysis unreliable . . . renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology." *Leese v. Lockheed Martin Corp.*, 6 F. Supp. 3d 546, 551 (D.N.J. 2014) (quoting *In re Paoli*, 35 F.3d at 745)).

In order to determine whether Mr. Rugemer's lack of citation to the FMCSRs renders his methodology unreliable, the court must first address whether the FMCSRs preempt state standards of care in the selection of an independent contractor in the trucking industry. The Third Circuit recognizes three categories of preemption: 1) express preemption that is stated in the statute's language or implicit in its structure and purpose; 2) conflict preemption that arises when a state law makes it impossible for a private party to comply with both state and federal requirements; and 3) field preemption that occurs when a field is reserved for federal regulation without room for state regulation and congressional intent is clear and manifest. *Elassaad v. Indep. Air, Inc.*, 613 F.3d 119, 126 (3d Cir. 2010) (citations omitted). "Both statutes and regulations can preempt state law." *Id.* (citation omitted).

In the present case, JB Hunt did not identify any evidence of express preemption, conflict between state law and federal regulatory requirements, or congressional intent to exclusively regulate the trucking industry utilizing the FMCSRs. Instead, rather than preempting state law, the FMCSRs establish only "minimum safety standards for commercial motor vehicles," *see* 49 U.S.C. § 31136(a), and the Secretary of Transportation is required to consider state laws and regulations on commercial motor vehicle safety when prescribing regulations "to minimize their unnecessary preemption." 49 U.S.C. § 31136(c)(2)(B).

In addition, although no court in the Third Circuit has addressed whether the FMCSRs impose exclusive duties in trucking cases bringing state law negligent hiring claims, the District of Maryland determined that a third-party logistics trucking company was subject to liability under Maryland common law, which recognized "that an employer may be held liable for negligence in 'selecting, instructing, or supervising' . . . [an independent] contractor." *Schramm v. Foster*, 341 F. Supp. 2d 536, 551 (D. Md. 2004). In *Schramm,* CH Robinson, a third party logistics company, independently contracted a motor carrier, Groff Brothers, which possessed a marginally satisfactory safety rating from the Federal Motor Carrier Safety Administration database. *Id.* at 542-43. One of the founders of Groff Brothers had previously managed another carrier that had contracted with CH Robinson, but had "experienced a safety performance problem which prompted the

formation of Groff Brothers." *Id.* at 542, 551. After CH Robinson contracted with

Groff Brothers, one of the latter's drivers caused a motor vehicle accident. *Id.* at

540-41. The court found under Maryland law that CH Robinson's "duty to use

reasonable care in the selection of carriers" included subsidiary duties to check the

safety statistics and evaluations of carriers and "to maintain internal records of the

persons with whom it contracts to assure that they are not manipulating their

business practices in order to avoid unsatisfactory ratings." *Id.*   In addressing the

compatibility of these duties with those imposed by the FMCSRs, the court

reasoned as follows:

> These obligations are not onerous, and . . . [the] imposition of
> such a common law duty would [not] be incompatible with
> the regulations promulgated by the FMCSR. To the contrary,
> imposing a common law duty upon third party logistics
> companies to use reasonable care in selecting carriers furthers
> the critical federal interest in protecting drivers and passengers
> on the nation's highways.

> *Id.* at 551-52.

Other federal courts have likewise found that the FMCSRs do not

preempt state law. *See, e.g.*, *Aycock v. U. S. Pipe and Foundry Co. LLC.*, Civ. No.

13-cv-0003, 2013 WL 3325495, *4 (M.D. Ga. June 28, 2013) (rejecting argument

that the FMCSRs preempt state law on negligent hiring); *Oaks v. Wiley Sanders

Truck Lines, Inc.*, Civ. No. 07-cv-0045, 2008 WL 2859021, *4 (E.D. Ky. July 22,

2008) (holding that state and common law claims are not preempted by the

FMCSRs). Based on the FMCSRs' intent to minimize the preemption of state laws and regulations on commercial vehicle safety and the reasoning in *Schramm*, the court finds that the FMCSRs are not the exclusive source for duties and standards in a state law negligent hiring claim. As a result, JB Hunt's arguments regarding Mr. Rugemer's lack of citation to the FMCSRs address the weight and credibility to be accorded to his report and testimony, rather than his reliability, and are better preserved for the jury. *In re TMI Litig.*, 193 F.3d 613, 713 (3d Cir. 1999) (citing *Breidor v. Sears, Roebuck & Co.*, 722 F.2d 1134, 1138-39 (3d Cir. 1983) ("Where there is a logical basis for an expert's opinion testimony, the credibility and weight of that testimony is to be determined by the jury, not the trial judge.")).

JB Hunt also characterizes Mr. Rugemer's conclusions regarding the standard of care as unreliable because, in preparing his report, he reviewed legal articles on a third party carrier-monitoring website known as Carrier411 that allegedly contradict the standards for freight brokers under the FMCSRs. (Doc. 69, p. 11.) Beyond JB Hunt's repeated protestations that the FMCSRs control the standard of care, and as a result, make all other contrary sources unreliable, JB Hunt fails to give any reasons as to why the Carrier411 website, upon which its own recruiter heavily relied, is unreliable. *See* JB Hunt's mere disagreement with Mr. Rugemer's opinions does not render his sources unreliable. *See Heller v. Shaw Indus., Inc.,* 167 F.3d 146, 160 (3d Cir. 1999) (stating that expert testimony cannot

be excluded simply because the expert uses one test rather than another). Further, JB Hunt will have an opportunity at trial to cross-examine Mr. Rugemer and present other contrary evidence that calls Mr. Rugemer's opinion into question. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). Because the court need only determine here whether the foundation for Mr. Rugemer's opinion is sufficient and reliable, and JB Hunt itself relies on Carrier 411,  the court finds that Mr. Rugemer's use of the Carrier411 website does not render his report unreliable.

Accordingly, for the reasons provided above, the court finds that Mr. Rugemer's opinion is reliable for purposes of satisfying Rule 702.

### C.    Fit

Finally, JB Hunt suggests that Mr. Rugemer's report does not "fit" to assist the trier of fact, and remains unreliable, because it contains false information and unsupported conclusions. (Doc. 69, pp. 12-20.) In response, Plaintiffs argue that Mr. Rugemer's report rests upon "good grounds" and that JB Hunt's arguments improperly address the weight of the evidence. (Doc. 70, pp. 9-17.)

First, JB Hunt asserts that Mr. Rugemer falsely concludes that "JB Hunt knew of or should have known that Hatfield Trucking consisted entirely of Ricky

Hatfield" (Doc. 68-2, p. 5 of 50), when Hatfield's deposition testimony revealed

that there were at least four additional drivers employed by Hatfield Trucking.

(Doc. 69, p. 12.) However, Mr. Rugemer's actually concluded that, upon entering

into the Outsource Carriage Agreement with Hatfield Trucking, "JB Hunt knew or

should have known that Hatfield Trucking consisted entirely of Ricky Hatfield

who had only recently obtained his DOT authority and had no DOT safety rating."

(Doc. 68-2, p. 5 of 50.) This statement was based on the JB Hunt carrier profile

application wherein Hatfield represented himself as the sole driver for Hatfield

Trucking. (*Id.* at p. 36 of 50.) As a result, the court finds that Mr. Rugemer had

"good grounds" for concluding that JB Hunt knew or should have known that

Hatfield was the sole driver for Hatfield Trucking at the time the parties entered

into the Outsource Carriage Agreement.

Next, JB Hunt argues that Mr. Rugemer's report erroneously refers to

Hatfield and Hatfield Trucking as an "owner/operator." (Doc. 69, pp. 12-15.)

However, JB Hunt misconstrues the thrust of Mr. Rugemer's analysis. According

to his report, typical owner/operator lease programs conduct "background

investigations and generate a Driver Qualification File." (Doc. 68-2, p. 9 of 50.) JB

Hunt's trademarked Power Carrier program, to which Hatfield Trucking belonged,

is identical to an owner/operator lease program except that JB Hunt chooses not to

perform these investigations on its Power Carriers. (*Id.*) Mr. Rugemer does not

16

label Hatfield Trucking or Hatfield as owner/operators, but instead refers to JB Hunt's terms and conditions for its owner/operator lease program in order to conclude that JB Hunt's internal hiring standards for owner/operators represent the proper hiring standard for any licensed truck driver, including Power Carriers. (*Id.*) As a result, Mr. Rugemer did not erroneously label Hatfield and Hatfield Trucking as owner/operators.

JB Hunt also asserts that Mr. Rugemer concludes, without support, that Hatfield Trucking was "under dispatch" for JB Hunt at the time of the accident and that this conclusion contradicts Hatfield's deposition testimony that he was not under dispatch at the time as well as the Outsource Carriage Agreement's requirements for tendering of a load. (Doc. 69, pp. 16-18.) However, in reaching his conclusion, Mr. Rugemer relies on JB Hunt's own internal documentation consisting of a load tender sheet and a confirmation sheet. (Doc. 68-2, pp. 10-11 of 50.) Both sheets indicate that the same trailer and load had been "tendered" to Hatfield and Hatfield Trucking early on November 19, 2013. (*Id.*) Therefore, the court finds that JB Hunt's internal documentation provides "good grounds" to conclude that Hatfield was under dispatch.

Finally, JB Hunt argues that Mr. Rugemer's conclusion that JB Hunt's Power Carrier program did not operate as an actual freight broker is mere *ipse dixit*. (Doc. 69, pp. 15-17.) However, in reaching this conclusion, Mr. Rugemer

relied, in part, on Section 4.1 of the Outsource Carriage Agreement, which required Hatfield Trucking to provide periodic updates to JB Hunt "on the status of any shipment for which it accepts tender." (Doc. 68-2, pp. 11-12 of 50.) His report then notes that JB Hunt requires the same periodic updates from their employees and contracted owner/operators. (*Id.*) Based on these two observations, Mr. Rugemer concludes that "any suggestion that [JB] Hunt was acting purely as a trucking broker is erroneous." (*Id.* at 12 of 50.) Because JB Hunt does not dispute the basis of the observations, but only offers a list of FMCSR definitions, standards, and facts that Mr. Rugemer failed to include in his report, its arguments relate to "questions of credibility or weight, not to the issue of admissibility." *E.E.O.C. v. FAPS, Inc.*, Civ. No. 10-cv-3095, 2014 WL 4798802, * 7 (D.N.J. Sept. 26, 2014) (citing *Walker v. Gordon*, 46 F. App'x 691, 695-96 (3d Cir. 2002)). Accordingly, the court finds that Mr. Rugemer's conclusion that JB Hunt's Power Carrier program did not act as a freight broker rests upon "good grounds."

In conclusion, because the court finds that Mr. Rugemer qualifies as an expert witness, that his opinions may be considered reliable, and that his testimony fits to assist the trier of fact, JB Hunt's motion *in limine* to exclude Mr. Rugemer's report and testimony will be denied.

**D.        Request for *Daubert* Hearing**

In the alternative to its motion *in limine* to preclude the report and/or testimony of Mr. Rugemer, JB Hunt moves for a *Daubert* hearing. Although the Third Circuit recognizes the importance of *in limine* hearings in making reliability determinations under Rule 702 and *Daubert*, "[a]n *in limine* hearing will obviously not be required whenever a *Daubert* objection is raised to a proffer of expert evidence." *Kerrigan v. Maxon Indus.*, 223 F. Supp. 2d 626, 633 (E.D. Pa. 2002) (quoting *Padillas v. Stork-Gamco*, 186 F.3d 412, 418 (3d Cir. 1999)). "Ultimately, the decision whether or not to hold a hearing rests within the sound discretion of the court." *Feit v. Great-West Life and Annuity Ins. Co.*, 460 F. Supp. 2d 632, 637 (D.N.J. 2006) (quoting *Oddi v. Ford Motor Co.*, 234 F.3d 136, 153 (3d Cir. 2000)). A *Daubert* hearing is not necessary when "the facts upon which the court must make its determination have been adequately presented to the court in the parties' papers and accompanying exhibits." *Parkinson v. Guidant Corp.*, 315 F. Supp. 2d 754, 756 n.1 (W.D. Pa. 2004) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 749 (3d Cir. 1994) ("Evaluating the reliability of scientific methodologies and data does not generally involve assessing the truthfulness of the expert witness and thus is often not significantly more difficult on a cold record.")). Here, the court finds that the parties' submissions are sufficient for the court to determine that Mr.

Rugemer is qualified to testify as an expert witness. Thus, the court will deny JB

Hunt's request for a *Daubert* hearing.

**IV.**     <u>**Conclusion**</u>

Based on the foregoing discussion, the court is satisfied that Mr.

Rugemer is qualified to testify under Rule 702. Accordingly, the court will deny JB

Hunt's motion to preclude his  expert report and testimony. The court will also

deny JB Hunt's request for a *Daubert* hearing.

An appropriate order will issue.

 s/Sylvia H. Rambo
SYLVIA H. RAMBO
United States District Judge

Dated: August 3, 2016